UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Polly Williams, | : | Case No. 1:06CV0371 |
| Plaintiff | : | |
| v. | : | Magistrate Judge David S. Perelman |
| Center For Health Affairs, et al., | : | |
| | : | **MEMORANDUM OPINION** |
| Defendants | : | |

      This case is before the Court on the motion of Defendant Center For Health Affairs, a.k.a. The Greater Cleveland Health Care Association and CHAMPS Management Services (collectively referred to as "CHA"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

      Plaintiff, Polly Williams, initiated this action on February 16, 2006 against the defendants alleging that she had been denied employment opportunities and discriminated against based on her age (over the age of forty) in violation of the federal Age Discrimination In Employment Act of 1967 (ADEA), 29 U.S.C. §621 et seq.,[1] as amended by the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. §626 et seq.

---

[1] The case was originally filed in the Cuyahoga Court of Common Pleas on January 11, 2006, but was removed to this Court by reason of this Court's original jurisdiction pursuant to 28 U.S.C. §1331, in light of the fact that this case involves a claim brought under federal law.

1

The plaintiff began her employment with an affiliate of CHA in June of 1998 as a Contract Specialist. Her duties remained unchanged in 2004 despite a change in job title to Materials Management Services Coordinator ("MMS Coordinator"). Mr. Timothy Andrejcak also was appointed to the position of MMS Coordinator in mid 2004, having been transferred to that position from a position in CHA's Facilities Department.

The plaintiff remained in that position until July 22, 2005, when she was informed in a staff meeting that as a part of a restructuring within the agency her job would be eliminated, along with that of Mr. Andrejcak and another co-worker, Ms. Jennifer Dyke. Also being eliminated was the position of GPO Coordinator which was held by Ms. Barbara Clemente. Instead, there would be a new position, Account Coordinator, to which they could apply. Ms. Williams received a letter dated July 22nd, officially informing her of these events, which stated in pertinent part:

> As you have been advised, The Center for Health Affairs has decided to restructure the MMS Internal Customer Service department as of July 27th. The MMS division has been losing clients for sometime and the organization needs to move it into a growth mode. For this reason, I regret to inform you that your position as a Customer Service Coordinator has been eliminated.
>
> The restructuring contains newly created positions that we feel will maximize our growth over the next 12 months. This packet contains the full job description for the new positions. **We are going to give you the opportunity to interview for either of the newly created positions.** Applications are included in this packet and must be submitted to the HR Director no later than July 25th to be considered. Interviews will be held on Monday July 25th. **If you are not chosen for one of the new positions or you choose not to interview for one, The Center has put together a severance package. This package is to assist with your transition to another employer, if you agree to the terms of a severance agreement.**
>
> Included in this packet are the new job descriptions, applications, and your personalized severance packet (**to be discussed only with**

2

> **your legal counsel**).

(Emphasis added.)

The plaintiff received another letter dated July 23, 2005, which explained her severance options in pertinent part:

> This revised letter serves to confirm the conversation between you and Michael Fox today, regarding our decision to restructure the MMS Internal Customer Service Department as of July 27th and how these changes impact you. Your current position as a Customer Service Coordinator has been eliminated. As mentioned previously, two new positions have been created. You will have an opportunity to interview for those positions of you are interested.
>
> **If you are not chosen for either position or choose not to apply the following severance package is offered to you.** Should you agree to the terms of a severance agreement the severance package will be payable to you eight (8) days after this letter has been signed if your acceptance has not been revoked prior to that time.
>
> In consideration for your employment and loyalty to The Center, we are prepared to offer you:
>
> 1) (i) a severance package of $9,040.50 representing fourteen (14) weeks of your gross salary, less appropriate withholdings for federal, state, local or other income or employment taxes and continuation of 401(k) contribution on your behalf through the end of your accrued vacation period. This compensation shall be payable in lump sum.
>
> 2) Unchallenged unemployment compensation benefits that you may qualify to receive.
>
> 3) A positive employment reference.
>
> In consideration for the severance package, you must agree to the following:
>
> 1) **You hereby voluntarily agree to waive and release The Center, and its present and former employees, officers, directors and related entities,**

>  **from any and all claims, charges and actions you may now have or hereafter assert, whether known or unknown, including those relating in any way to your employment, or to your termination from employment with The Center. This includes a release of any claims** for wrongful discharge, constructive discharge, defamation, breach of express or implied contract, employee benefits, promissory estoppel, tortious conduct, or claims **under any federal, state or local employment statute, law order or ordinance, including any claims for discrimination, and rights under the Age Discrimination in Employment Act.**
>
>  \* \* \* \* \*
>
> 4) **You understand and agree that this agreement and the severance benefits described in the letter do not constitute an admission by The Center or any of its employees, officers, directors, representatives, or related entities or any liability to you or wrongdoing whatsoever.**
>
> 5) **You understand that you have the option to consider and reflect upon this agreement for up to forty-five days before signing it. It is advised that you consult with an attorney and/or other professionals such as accountants or financial advisors concerning its terms and entry into it. You will be responsible for your attorney's fees and costs should you choose to have counsel review the agreement. This also acknowledges the intent of both parties to comply with the age discrimination waiver requirements of the Older Worker Benefit Protection Act of 1990.**
>
>  \* \* \* \* \*
>
> 8) For a period of seven (7) days after you sign this agreement and return it to The Center, you may revoke it. This agreement will not become effective until that period has expired.

4

>    9)    You acknowledge that no promise, inducement or agreement not expressed in this letter has been made to you, and that **this letter constitutes the complete, contractual agreement** between you and The Center For Health Affairs.

(Emphasis added.)

Plaintiff signed the severance agreement and general release on July 25, 2005, indicating her acceptance of its terms, without having interviewed for the two new positions.

On September 29, 2005 the plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which she alleged that her employer had retaliated and discriminated against her based on her age.  She was issued a Notice of Right to Sue on October 21, 2005.

In its motion for summary judgment, the defendant argues that plaintiff cannot establish a prima facie case of age discrimination in light of the facts that she admitted that she was not qualified for the newly created position and refused to interview for it, and that she was not replaced.  The defendant also asserts that even if plaintiff could somehow meet her burden of production regarding a prima facie case, it has provided evidence that her previous position was eliminated for financial reasons, which is a valid, non-discriminatory reason for terminating her employment.  Defendant also argues that in light of the fact that plaintiff executed a severance agreement in which she released any claims of age discrimination this case should never have been brought and summary judgment is warranted.

In opposing the motion, the plaintiff contends that there was direct evidence of age discrimination, that CHA's stated reasons for the termination were pretextual, and that the severance agreement executed by her was invalid.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the

Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. Tee-Pak, Inc. v. St. Regis Paper Co., 491 F.2d 1193 (6th Cir. 1974); 6 Moore's Federal Practice 56.15 [1.-0].

It is the initial burden of the moving party to demonstrate the absence of a genuine issue of material fact as to an essential element of the claims brought by the non-moving party. Curto v. Harper Woods, 954 F.2d 1237, 1241 (6th Cir. 1992); Wilson v. Zanesville, 954 F.2d 349, 350-351 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989).

In Street v. J.C. Bradford & Co., supra, the Sixth Circuit Court of Appeals reviewed three then recent decisions of the United States Supreme Court addressing summary judgment practice, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).[2] The court summarized those cases as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind issues (such as discriminatory action) are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law")

---

[2]After the passage of a number of years the court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true, but the characterization of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". Id. at 1479-1480 (Footnotes and citations omitted.)

At the outset, the issue of the validity of the release will be considered as if that question is answered in the affirmative, plaintiff's age discrimination claims would be barred from this Court's consideration.

The OWBPA, which became effective October 16, 1990 as an amendment to the ADEA, was enacted to clarify the conditions under which an employee may waive his/her right to bring an ADEA claim in exchange for a severance or settlement agreement. Parsons v. Pioneer Seed Hi-Bred International, Inc., 447 F.3d 1102, 1104 (8th Cir. 2006), citing Long v. Sears Roebuck & Co., 105 F.3d 1529, 1534 (3d Cir. 1997), cert. denied, 522 U.S. 1107 (1998). Any such waiver must be made knowingly and voluntarily, which is determined by meeting a number of requirements listed in Section 626(f), of the Act, captioned "Waiver":

> (1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum--
>
> (A) the waiver is part of an agreement between the

individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or

> (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at lest 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to–

> (i) any class, unit, or group of individuals covered by such

>program, any eligibility factors for such program, and any time limits applicable to such program; and
>
>(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.
>
>* * * * *
>
>(3) In any dispute that may arise over whether any of the requirements, conditions, and circumstances set forth in [the above subparagraphs] have been met, the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary pursuant to (1) or (2)....

Section 626 was enacted in order to require employers to provide data to an employee considering waiving ADEA rights so that the employee, after consulting with counsel, can effectively determine whether an ADEA claim could succeed. Raczak v. Ameritech Corp., 103 F.3d 1257, 1259-60 (6th Cir. 1997).

Defendant argues in support of summary judgment that the specific terms of the agreement signed by plaintiff complied with the foregoing, as evidenced in part by the fact that she was provided with the appropriate time to consider its terms before signing it and that she was advised to consult with an attorney before signing it, both of which she decided not to do.

In response, the plaintiff asserts that she was only given one weekend to consider the terms of the severance agreement, and that her employer failed to provide her with "any of the information, either in writing or at all, required by the OWBPA, which places the burden on 'the party asserting the validity of a waiver' of proving its compliance therewith."

9

When deposed, the plaintiff stated that it was Ms. Karen Schmidt, CHA Human Resources Manager, who informed her that she only had the weekend to decide whether to accept the terms of the severance agreement or to apply for the new positions, but that if she applied for the positions and was not hired, the terms of the severance package were "off the table." That contention, however, is contravened by the terms of the agreement itself which state that she was entitled to the severance package whether or not she interviewed for the new positions, which provided her 45 days to consider its terms and 7 days to revoke it once she signed it. Further, Ms. Schmidt denied having made such a statement to plaintiff.

As for plaintiff's claim that her employer failed to provide her with "any of the information, either in writing or at all, required by the OWBPA," Ms. Schmidt admitted during her deposition that the plaintiff was neither informed in writing of the titles of the other positions being eliminated, nor was she informed of the ages of the persons whose positions were being eliminated. Defendant having offered no evidence to suggest an inaccuracy in Ms. Schmidt's deposition testimony in this regard, has failed to meet their burden on demonstrating the validity of the waiver and, therefore, the waiver must be deemed as invalid.

Turning to the merits of plaintiff's claim, the ADEA forbids employers to discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a); Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 141 (2000). A cause of action for age discrimination can be proven with either direct or circumstantial evidence that an adverse employment action was taken based upon the plaintiff's age. Minadeo v. ICI Paints, 398 F.3d 751, 763 (6th Cir. 2005); Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003).

Direct evidence of age discrimination has been found to be "'evidence that proves the existence of a fact without requiring any inferences.'" Minadeo v. ICI Paints, supra at 763, quoting Rowan v. Lockheed Martin Energy Systems, 360 F.3d 544, 548 (6th Cir. 2004). It has also been defined as "that evidence, [which] if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Wexler v. White's Fine Furniture, Inc., supra at 570, quoting Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).

The plaintiff in the present case argues that the following incidents provided direct evidence of age discrimination in her termination:

> 1) a comment made in 2002 by CEO William Ryan during a meeting with then Vice President of Sales John Piazza that it would be CHA's new plan to hire people "right out of school."
>
> 2) a statement made in 2004 by one of the CHA's management-level employees that CHA wanted "young blood in [here]."
>
> 3) a statement overheard in 2004 by the plaintiff, made by CFO Phil Mazanec to Mr. Andrejcak about a new hire, in which he stated that they hired the person because they wanted "younger blood."
>
> 4) in January of 2006, after the CHA hired Ms. Margaret Gole (who was 69 years old), former GPO Debbie Christopher overheard a conversation between Ms. Laura Gronowski, the 67 year old Senior Vice President of CHAMPS (a business unit of the CHA) and Mr. Michael Fox, Senior Director of MMS (and plaintiff's supervisor), wherein Mr. Fox, referring to that hire, asked Ms. Gronowski "do you only know old people?"
>
> 5) in June of 2006, Ms. Christopher indicated that she intended to quit her position with the CHA, at which point Mr. Mazanec told her that the CHA was moving in a "positive direction" and was "getting a lot of...young people in here now."

Assuming for the purposes of this motion that the foregoing statements were actually made, the

11

Sixth Circuit Court of Appeals has held that statements which appear to show direct evidence of an employer's bias against older workers must be considered in conjunction with the following four factors:

> 1) whether the statements were made by a decision-maker or by an agent within the scope of his employment;
>
> 2) whether the statements were related to the decision-making process;
>
> 3) whether the statements were more than merely vague, ambiguous or isolated remarks; and
>
> 4) whether they were made proximate in time to the act of termination.

Peters v. Lincoln Electric Co., 285 F.3d 456, 477-78 (6th Cir. 2002). Accord, Skelton v. Sara Lee Corp., Unreported, 2007 U.S. App. LEXIS 23521 (6th Cir. October 3, 2007).

According to the deposition testimony of Ms. Schmidt, it was Ms. Gronowski and Mr. Fox who made the recommendation to eliminate the MMS positions, including plaintiff's, and then the recommendation was adopted by CEO William Ryan. The severance agreement and release dated July 25, 2005 was also signed by COO Philip Mazanec.

In considering the comments alleged to have been direct evidence of age discrimination, this Court finds that the first one, made in 2002, was not made sufficiently proximate in time to the reorganization to constitute direct evidence. The same holds true with the second and third statements, which were made in 2004.

Similarly, in light of the fact that the second statement was not attributed to a particular person, it cannot be assessed against the foregoing factors and, therefore, may not be considered direct evidence of discrimination.

As for the fourth statement, "Do you only know old people?", it was a vague, ambiguous or isolated remark made to a 67 year old executive regarding a new hire, and was not related to the decision to reorganize the MMS department at issue herein.

Finally, the statement made in June of 2006 that the CHA was moving in a "positive direction" and was "getting a lot of...young people in here now," would have to be read with the inference that it was due to the young people that the company was moving into the positive direction. There would also need to be an inference that the reorganization was prompted by the notion that younger employees would make the CHA move into a positive direction. In light of the fact that such an inference would be necessary, this would not be direct evidence of discrimination.

Absent direct evidence of discrimination, this Court must look to the seminal case on employment discrimination, McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), to determine whether there is circumstantial evidence of discrimination. The United States Supreme Court delineated a four-part formula by which a plaintiff can establish a prima facie case by showing, that he/she (1) was a member of a protected class, (2) was qualified for the position and performed it satisfactorily, (3) was discharged or suffered an adverse employment action, and (4) either that his/her position was filled by a non-member of the protected class or that he/she was treated less favorably than similarly situated individuals. Id. at 802; see also, Johnson v. University of Cincinnati, 215 F.3d 561, 572-74 (6th Cir.), cert. denied, 121 S.Ct. 657 (2000); Allen v. Ohio Department of Rehabilitation and Correction, 128 F.Supp. 2d 483 (S.D.Ohio 2001). This test is also used by the Ohio courts when faced with alleged violations of Ohio's anti-discrimination statutes. Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992). Accord,

Fenton v. HiSan, Inc., 174 F.3d 827, 829 (6th Cir. 1999).

In cases where there has been a work force reduction, the fourth element is replaced by the requirement that plaintiff provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Reeher v. Baker Material Handling Corp., 996 F.2d 1216 (6th Cir. 1993), citing Barnes v. GenCorp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990). Accord, Allen v. Diebold, Inc., 33 F.3d 674, 677 (6th Cir. 1994).

The Sixth Circuit Court of Appeals has provided the following parameters in determining whether there has been a reduction in force:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

Barnes v. GenCorp. Inc., supra at 1465 (Emphasis added.) (Citations and footnotes omitted.)

When a prima facie showing of discrimination is made there is a rebuttable presumption that the employer has engaged in impermissible discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). At that point the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment decision. McDonnell Douglas, 411 U.S. at 802; Turic v. Holland Hospitality, Inc., 85 F.3d 1211, 1214 (6th Cir. 1996). The employer may produce evidence that "the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." Manzer v. Diamond Shamrock

Chemicals Co., 29 F.3d 1078, 1082 (6th Cir. 1994) (quoting Texas Dep't of Community Affairs v. Burdine, supra at 254). Once the employer has met the foregoing burden of production the presumption of discriminatory animus is no longer in effect.

If there is negation of the presumption of discriminatory animus the factfinder is back to square one, and must determine whether the challenged employment action was motivated by discriminatory animus, taking into consideration all evidence of record, including any evidence indicating that the reason articulated by the employer for the action was pretextual. A plaintiff may accomplish this either by showing that the proffered reason is unworthy of belief, or that the true reason for the his/her rejection, notwithstanding the proffered reason, was of a discriminatory nature. Goostree v. Tennessee, 796 F.2d 854 (6th Cir. 1986), cert. denied, 480 U.S. 918 (1987).

> "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1982 (6th Cir. 1994) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). In order to challenge the credibility of an employer's explanation, the plaintiff must show by a preponderance of the evidence: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the adverse employment action; or (3) the proffered reasons were insufficient to motivate the adverse employment action. See Manzer, 29 F.3d at 1084 (quoting McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993)).

E.E.O.C. v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 834 (6th Cir. 1997). Accord, Zambetti v. Cuyahoga Community College, 314 F.3d 249, 258 (6th Cir. 2002). The plaintiff always retains the ultimate burden of persuasion. E.E.O.C. v. Yenkin-Majestic, supra at 834, citing Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir. 1987).

15

When the foregoing issues are raised upon motion for summary judgment the following applies:

> In the context of a summary judgment proceeding, [St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)] requires that, once the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on [discrimination]. . ." Direct or indirect evidence of discriminatory motive may do but 'the evidence as a whole. . .must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by [discriminatory] animus.'". . .Thus, the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer.

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). (Citations and footnotes omitted.) Accord, Manzer v. Diamond Shamrock Chemicals Co., supra at 1083, n.3.

Although disbelief of the employer's proffered reason for employment actions together with the facts making up the prima facie case may suffice to show discrimination, "nothing in law would permit [a court] to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 514-15 (1993).

Turning to the present case, there is no dispute that plaintiff has satisfied the first and third elements of a prima facie case of employment discrimination in that as a female over the age of 40 she is clearly a member of a protected class and she was terminated from employment with CHA. For purposes of this motion, this Court will assume, without deciding, that the plaintiff has

16

established the remaining elements of a prima facie case of age discrimination, thus satisfying the first prong of the McDonnell Douglas framework.

In light of the foregoing the burden shifted to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision. CHA maintains that it has done so with evidence that the MMS Coordinator positions were eliminated as a response to the loss of clients, a proposition supported by the following deposition testimony of Ms. Schmidt:

> Q. Now, I think you've indicated that these positions were eliminated as a cost-cutting measure. You indicated financial reasons. Tell me why the positions were eliminated. Let's put it that way.
>
> A. The positions were eliminated because we had lost several of our acute care hospitals, and revenue had gone down.
>
> For years this division had simply sat back and not tried to grow– not really cultivated customer relations. With the result of us losing these clients, we had to change the way we did business. We had to become partners with our clients in their purchasing arena.
>
> Q. What do you mean by that, had to become partners?
>
> A. We had to be more connected– build stronger relationships with our clients, in order to maximize their contract usage.
>
> Q. What do you mean by maximize their contract usage? The more products that they purchase through your organization, the more revenues that your organization generates; am I understanding that?
>
> A. They don't purchase through our organization. They purchase on the Premier contracts.
>
> Q. Okay.
>
> A. And yes, our revenue does increase if they purchase on those Premier contracts.

> Q. Were the elimination of these positions seen as a way to cut out some of the– cut out overhead, or cut out some of the costs associated with the MMS operations?
>
> A. The positions were eliminated because we needed to change the way we did business.
>
> Q. I understand that. Was cost a factor?
>
> A. I don't know the answer to that. I mean, we had three positions that we created, so we were eliminating one job, basically.
>
> Q. And you indicated it was not– was it not performing at that time? The MMS department, from a financial perspective, was not performing as well as it had in the past?
>
> A. Yes.
>
> Q. Okay. And why was the GPO account manager position eliminated?
>
> A. That position was eliminated because that person had— a large number of their clients were clients that we had lost. And we didn't have a large number of clients in the Youngstown area.
>
> \* \* \* \* \*
>
> Q. Okay....And Barbara Clemente held that position, correct, the GPO account manager position that was eliminated?
>
> A. Yes.
>
> Q. And she serviced the Youngstown area?
>
> A. She serviced the acute-care clients that we no longer had.

Ms. Schmidt testified further that in reaching the decision to eliminate positions, management "looked at financials over the past few years, how we were conducting our business, and what we needed to do to move into a growth mode."

This Court finds that in providing the foregoing rationale for eliminating the positions at

issue, CHA has clearly met its burden of articulating a legitimate, non-discriminatory reason for its adverse employment decision, and the presumption of discriminatory animus is no longer in effect.

In arguing that the reason proffered by the CHA for eliminating the positions was pretextual, the plaintiff focuses on her termination and the selection of Mr. Andrejcak to fill the new position, for which she believed herself to be more qualified than he, a proposition for which she proffers numerous rationales.

It is at this point that it becomes readily apparent that there is no genuine issue of material fact as to a consideration entitling the defendant to judgment in its favor. After the elimination of the MMS Coordinator positions and the creation of the new positions the plaintiff, despite having been offered the opportunity and admittedly having been told by representatives of her employer to do so, refused to apply and interview for them. It is undisputed that: (1) Ms. Schmidt, who would be interviewing for the new positions, told plaintiff to apply for them; (2) that the severance agreement signed by plaintiff informed her of the positions and of her opportunity to interview for them; and (3) that plaintiff signed a document captioned "CHA Internal Job Posting Application Form" which indicated that although she had been offered the opportunity to interview for the new positions, she declined to do so. If plaintiff expects to succeed in her arguments that her employer's legitimate business reason for terminating her was pretextual, as evidenced by the way her employer treated her versus the way her younger co-worker was treated in being terminated then re-hired, she need to at least make the effort of applying for the new positions (one of which was filled by that younger co-worker) and giving her employer the opportunity to hire her or to refuse to do so, before claiming that there was discriminatory intent in the process.

Plaintiff's attempts to argue futility are unconvincing to this Court. In the context of determining whether a plaintiff had established a prima facie case of discrimination, the Sixth Circuit Court of Appeals considered the discrimination plaintiffs' stated rationale for their failure to apply for a position, i.e., that it was futile to do so considering the discriminatory nature of the promotions process embraced by their employer, and rejected it, holding that absent "'overwhelming evidence of pervasive discrimination in all aspects of [the employer's] internal employment practices,'"... "it is not unreasonable to expect plaintiffs to make such a minimal effort to preserve their rights." Bacon v. Honda of America Manufacturing, Inc., 370 F.3d 565, 576 (6th Cir. 2004) (quoting Harless v. Duck, 619 F.2d 611, 617-18 (6th Cir. 1980)). This Court is of the same mind, and there is no such showing of overwhelming evidence of pervasive discrimination in all aspects of this plaintiff's employer's employment practices.

In light of all the foregoing, this Court holds that even if the plaintiff had been able to meet her burden of production as regards a prima facie case of age discrimination, the defendant has met its burden of demonstrating a legitimate, non-discriminatory reason for its adverse employment decision, and there is no genuine issue of material fact as to pretext. It follows that defendant's motion for summary judgment will be granted.

s/DAVID S. PERELMAN
United States Magistrate Judge

DATE:    October 24, 2007